# EXHIBIT A

# CIVIL INTAKE SHEET

**CIVIL ACTION NUMBER:** CL-_____ - ____2019 05446____

**HOW RECEIVED:** COUNTER

**JUDGMENT AMOUNT: $**_____

**FILING FEE: $** _346⁰⁰_____ CHECK ✓ CASH ____ MO ____ CREDIT CARD____

**CREDIT CARD FEE: $**_____

**TOTAL AMOUNT: $** _346⁰⁰_____     **VS-4 FORM:** YES ____ NO____

**CLERKS INITIALS:** _CMD_____     **ID Presented (CWP):** _____

**SERVICE TYPE:**

SHERIFF: _____     SPS: _____
                    RM: _____
OPUB: _____        CM: _____
SOC: ✓ DMV:____ SCC:____

| SHERIFF | AMOUNT |
|---------|--------|
| _____  | _____ |
| _____  | _____ |
| _____  | _____ |
| _____  | _____ |
| _____  | _____ |
| _____  | _____ |
| _____  | _____ |
| _____  | _____ |

**SPECIAL INSTRUCTIONS:**

**CERTIFIED COPIES:** _____

Contract

Civil Intake -- Intake Sheet     Updated 7/5/18

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

BOOZ ALLEN HAMILTON HOLDING
CORPORATION
8283 Greensboro Drive
McLean, VA 22102,

              Plaintiff,

    v.

RAMEZ TANNOUS SHEHADI
Afeiche Building, 2nd Floor
Edde Street, Hamra
Beirut, Lebanon

and

WALID FAYAD
Ghanoum Villa
Ground Floor, Bliss Street
Beirut, Lebanon,

              Defendants.

Civil Action No.  **2 0 1 9   0 5 4 4 6**

**Jury Trial Demanded**

## COMPLAINT

Plaintiff Booz Allen Hamilton Holding Corporation ("Booz Allen" or "Plaintiff"), by and through its attorneys, DLA Piper LLP (US), as and for its Complaint against Defendants Ramez Tannous Shehadi ("Shehadi") and Walid Fayad ("Fayad," and together with Shehadi, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.    This is an action to recover monies and equity interests improperly retained by Defendants, high-level senior executives formerly employed by Booz Allen Hamilton Inc. ("BAH Inc."), a wholly owned subsidiary of Plaintiff, in breach of their contractual obligations and part

and parcel with their deliberate scheme to raid BAH Inc. of its confidential information, key employees, and competitive advantage.

2.      In connection with their employment as Executive Vice Presidents with BAH Inc., Defendants were granted lucrative equity awards and stock options from Booz Allen, a Delaware corporation based in McLean, Virginia. The terms and conditions of their awards were governed by the Second Amended and Restated Equity Incentive Plan of Booz Allen Hamilton Holding Corporation (the "Plan"), a binding written agreement between the parties.[1]

3.      Following their offers of employment in April 2014, and subsequent hire in June 2014, and continuing for more than three years thereafter, Defendants received a series of grants and awards of restricted stock, units, stock options, and other equity from Booz Allen pursuant to the Plan. All the while, Defendants—highly compensated executives with key decision-making responsibilities in BAH Inc.'s branch office in Abu Dhabi—were entrusted with unique, high-level access to proprietary, highly confidential, competitively sensitive information regarding Booz Allen's and BAH Inc.'s Middle East region business, clients, and employees.[2]

4.      Notwithstanding their contractual and other legal obligations, beginning in early 2017, Defendants embarked on a deliberate, surreptitious, and continuous scheme to misuse and misappropriate BAH Inc.'s Middle East region resources, personnel, information, and competitive advantage for personal gain.

---

[1] All Plan provisions cited and quoted herein are to those contained in the Second and Amended Restated Equity Incentive Plan, a true and correct copy of which is attached as **Exhibit A** hereto. Unless otherwise noted, all capitalized terms herein are defined as set forth in the Plan. As alleged herein, the Second and Amended Restated Equity Incentive Plan took effect shortly after Defendants commenced employment in June 2014 and for all relevant purposes is identical to the Amended and Restated Equity Incentive Plan previously in effect.

[2] Defendants, as explained below, were engaged in the development and performance of the Middle Eastern commercial business of Booz Allen and BAH Inc., and while they were heavily engaged in communications and were given executive direction from McLean, Virginia, they were not involved in the U.S. government or U.S commercial business during their employment.

2

5.     As further described herein, Defendants, while still employed and without Plaintiff's or BAH Inc.'s knowledge or consent, embarked on a months-long scheme to leave BAH Inc.'s employ and instead secure even more lucrative employment with a direct competitor. Defendants' illicit scheme included, among other things, repeatedly sharing and disclosing BAH Inc.'s proprietary, confidential, sensitive information regarding its Middle Eastern business to unaffiliated third parties—including to the direct competitor with whom Defendants were negotiating.  Defendants also carried on a recruiting campaign to actively solicit key BAH Inc. personnel to join them in their illicit venture, while making misleading assertions to BAH Inc. leadership relating to their future plans to remain with BAH Inc.  And Defendants supported the vast majority of their efforts using Plaintiff's and BAH Inc.'s funds, resources, equipment, information, and personnel.

6.     As a result of these and other actions by Defendants as set forth herein, BAH Inc. terminated Defendants' employment for Cause on or about October 13, 2017.

7.     Pursuant to the terms of the Plan, "any Award vested or paid to the Participant or otherwise settled during the twelve months prior to or at any time after the Participant engaged in the conduct that gave rise to the termination for Cause shall upon demand by the Administrator be immediately forfeited and disgorged or paid to the Company [Booz Allen] together with all gains earned or accrued due to the exercise of such Awards or sale of Company [Booz Allen] Common Stock issued pursuant to such Awards."  Moreover, if a Participant under the Plan engages in Competitive Activity following the termination of employment, any Awards vested, paid or settled in the twelve months prior to engaging in such Competitive Activity is similarly subject to forfeiture and disgorgement upon demand by the Administrator.  Accordingly, as Defendants have failed to comply with a demand for disgorgement which was properly issued by the Administrator,

3

Defendants are required under the Plan to forfeit and disgorge all awards they were granted under the Plan, and, to the extent they sold or exercised shares pursuant to any such awards, pay Booz Allen any earnings therefrom.  Defendants have not done so.

8.    Through this Complaint, Booz Allen seeks, among other relief, forfeiture and/or disgorgement of any and all equity Awards granted to Defendants pursuant to the Plan, and damages in an amount no less than the sum of "all gains earned or accrued due to [Defendants'] exercise of such Awards or sale of Company [Booz Allen] Common Stock issued pursuant to such Awards."

## PARTIES

9.    Plaintiff Booz Allen is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 8283 Greensboro Drive, McLean, Virginia 22102.

10.    Defendant Shehadi is a former employee of BAH Inc. and, upon information and belief, is a resident of Lebanon and a citizen of Canada, and who has formerly resided in the United States.

11.    Defendant Fayad is a former employee of BAH Inc. and, upon information and belief, is a resident of Lebanon and a citizen of Lebanon.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to VA. CODE ANN. § 17.1-513, because, among other things, this is a civil case with one or more claims to recover money in an amount greater than $100.

13.    This Court has personal jurisdiction over each Defendant pursuant to the Virginia Long-Arm Statute, VA. CODE ANN. § 8.01–328.1, because, among other things, Defendants

4

transacted business in the Commonwealth of Virginia, contracted with Plaintiff in the Commonwealth on matters from which this action arose, and because this action arises from Defendants' breaches of contracts that were negotiated, executed, and performed in the Commonwealth.

14.    Venue is proper in this Court pursuant to VA. CODE ANN. § 8.01-262, because, among other things, Plaintiff's cause of action (or a part thereof) arose in Fairfax County, and because Plaintiff resides in Fairfax County while all of the Defendants are non-residents of the Commonwealth and/or their residence is unknown.

## FACTS

15.    BAH Inc. is a global management and information technology consulting firm that provides consulting, engineering, digital solutions, data analytics, and technology solutions for government agencies, commercial customers, and not-for-profit organizations both in and outside the United States.

16.    Booz Allen is a publicly held company, and its common stock trades on the New York Stock Exchange.

17.    BAH Inc. is a wholly owned subsidiary of Booz Allen.

18.    At all relevant times herein, Booz Allen's and BAH Inc.'s corporate headquarters have been located at 8283 Greensboro Drive, McLean, Virginia 22102.

19.    At all relevant times herein, Booz Allen's operational activities and executive functions, including all activities relating to the administration of the Plan, have been directed, controlled, and coordinated from the corporate headquarters of BAH Inc. (an operating subsidiary of Booz Allen) in McLean, Virginia.

20.     At all relevant times herein, all employee payroll, employee benefits, and human resources functions have been directed, controlled, and coordinated from Booz Allen's corporate headquarters in McLean, Virginia.

21.     At all relevant times herein, all internal and employee-related legal matters have been directed, controlled, and coordinated by Booz Allen's People Services and its Law Department (now called its "Legal Department") based at the corporate headquarters in McLean, Virginia.

## A.     Defendants Join BAH Inc. as Executives after Heavily Negotiating Their Equity Compensation

22.     In or around December 2013, Defendants began negotiating the terms of their potential employment as senior executives in BAH Inc.'s branch office in Abu Dhabi, United Arab Emirates ("UAE").

23.     Defendants expressly negotiated for equity compensation under the Plan with executives based at Booz Allen's headquarters in McLean Virginia, including conversations with Virginia-based recruiting, executive compensation, and other personnel.

24.     Among other things, Defendants participated in telephone calls with Booz Allen's Virginia-based executives, engaged in email communications with executives based in Virginia and traveled to Booz Allen's corporate headquarters in McLean, Virginia in the course of negotiating their equity awards.

25.     Shehadi pressed for greater equity compensation on behalf of a group of potential new BAH Inc. employees, including Fayad and Shehadi himself.  Shehadi personally transmitted several email communications to key Booz Allen executives and human resources personnel located in Virginia on behalf of himself and the group, in addition to phone calls to Virginia regarding the topic.

6

26.    On or about April 4, 2014, Shehadi and Fayad both accepted employment as Executive Vice Presidents based in BAH Inc.'s Abu Dhabi, UAE branch office, to begin their actual employment on or about June 1, 2014.

27.    Among other benefits, Shehadi and Fayad were offered the opportunity to participate in the Plan and to receive awards of shares, stock options, and other forms of equity (collectively, "Awards") in Booz Allen subject to the terms and conditions of the Plan, described further below.

**B.    Defendants Voluntarily Agree to the Terms and Conditions of Plaintiff's Equity Incentive Plan Reserved for Key Employees and Executives**

28.    An offer to participate in the Plan is generally reserved only for key employees, executives, and employees in management or leadership positions.    Generally, only Vice Presidents and higher receive the offer to participate in the Plan.

29.    As stated on page 1, one purpose of the Plan is to "provid[e] additional incentives to employees, consultants and directors of the Company and its Subsidiaries, who have been or will be given responsibility for the management or administration of the Company's (or one of its Subsidiaries') business affairs, by assisting them to become owners of Company Common Stock, thereby benefiting directly from the growth, development and financial success of the Company and its Subsidiaries."

30.    As further stated on page 1, a second purpose of the Plan is to "enable the Company (and its Subsidiaries) to obtain and retain the services of the type of professional, technical and managerial employees, consultants and directors considered essential to the long-term success of the Company (and its Subsidiaries) by providing and offering them an opportunity to become owners of Company Common Stock pursuant to the exercise of Options, the grant of Restricted

7

Stock or Restricted Stock Units, the grant of Performance Awards, the grant of other Stock-Based Awards or an offer to purchase shares of Company Common Stock."

31.    The Plan defines "Company" as "Booz Allen Hamilton Holding Corporation, a Delaware corporation, and any successor."

32.    The Plan is administered by Booz Allen's Board of Directors (the "Board") or "any committee of the Board designated by the Board to administer the Plan."

33.    The Board has designated its Compensation Committee as the Administrator of the Plan, and the Compensation Committee has served as Administrator at all relevant times.

34.    The Plan grants the Administrator authority to determine in its discretion various matters relating to Awards issued to individuals who participate in the Plan.

35.    Section 12.2(d) of the Plan states, in pertinent part:

Section 12.2    Powers of the Administrator.   Subject to the provisions of the Plan and, in the case of a committee, the specific duties delegated by the Board to such Administrator, and subject to the approval of any relevant authorities, the Administrator shall have the authority in its discretion to:

. . .

(d)     determine all matters and questions related to the termination of service of a Service Provider with respect to any Award granted to him or her hereunder, including, but not by way of limitation of, all questions of whether a particular Service Provider has taken a leave of absence, all questions of whether a leave of absence taken by a particular Service Provider constitutes a termination of service, and all questions of whether a termination of service of a particular Service Provider resulted from discharge for Cause. . . .

36.    Accordingly, at all relevant times herein, the Board's Compensation Committee, as the Plan's Administrator, had the authority to determine in its discretion all questions related to whether termination of a "Service Provider" constituted a termination for Cause.

37.    During his employment with BAH Inc., Shehadi was a Service Provider under the Plan.

8

38.     During his employment with BAH Inc., Fayad was a Service Provider under the Plan.

39.     Accordingly, at all relevant times herein, the Board's Compensation Committee, as the Plan's Administrator, had the authority to determine in its discretion all questions related to whether Shehadi's and/or Fayad's termination of employment with BAH Inc. constituted a termination for Cause.

40.     In addition, Section 12.2 of the Plan grants the Administrator the authority in its discretion to, among other things, "determine the terms and conditions of any Awards granted hereunder," "construe and interpret the terms of the Plan and Awards granted pursuant to the Plan," and "make all other decisions and determinations that may be required pursuant to the Plan or as the Administrator deems necessary or advisable to administer the Plan."

41.     Accordingly, at all relevant times herein, the Board's Compensation Committee, as the Plan's Administrator, had the authority to determine in its discretion the terms and conditions of any and all Awards granted to Defendants.

42.     The Plan provides that Awards thereunder are subject to forfeiture, disgorgement, and/or repayment by the Participant upon certain conditions.

43.     For example, Section 11.1 of the Plan provides:

Section 11.1   Termination for Cause.   Unless otherwise determined by the Administrator at or after the grant date and set forth in the Award Agreement covering the Award or otherwise in writing, if a Participant's employment or service terminates for Cause, all Options and SARs, whether vested or unvested, and all other Awards that are unvested or unexercisable or otherwise unpaid (or were unvested or unexercisable or unpaid at the time of occurrence of Cause) shall be immediately forfeited and canceled, effective as of the date of the Participant's termination of service.   Notwithstanding the foregoing, unless otherwise determined by the Administrator at or after the grant date and set forth in the Award Agreement covering the Award or otherwise in writing, any Award that vested or was paid to the Participant or otherwise settled during the twelve months prior to or at any time after the Participant engaged in the conduct that gave rise to the

9

termination for Cause shall upon demand by the Administrator be immediately forfeited and disgorged or paid to the Company together with all gains earned or accrued due to the exercise of such Awards or sale of Company Common Stock issued pursuant to such Awards.

44.    Accordingly, at all relevant times herein, the Board's Compensation Committee, as

the Plan's Administrator, had the authority to demand that a Participant who engaged in conduct

giving rise to a termination for Cause immediately forfeit and disgorge, and repay all gains earned

or accrued in connection with the exercise of or sale of stock issued under, any Award that vested

or was paid to the Participant during the twelve months prior to and/or at any time after such

conduct.

45.    Section 11.4 of the Plan similarly provides:

Section 11.4    Forfeiture of Awards.

. . .

(d)    Forfeiture for Other Misconduct.  Unless otherwise determined by the Administrator, if (i) the Participant's performance is deemed to contribute substantially to the Company or a Subsidiary incurring significant financial losses; (ii) the Participant's performance is deemed to contribute substantially to a significant downward restatement of any published results of the Company or a Subsidiary; (iii) the Participant engages in conduct that results in or contributes substantially to significant reputational harm to the Company; (iv) the Participant materially breaches or contributes substantially to a material breach of applicable legal and/or regulatory requirements; (v) the Participant engages in conduct that constitutes Cause or (vi) the Participant engages in conduct that results in or contributes substantially to a material breach of the Company's applicable internal policies and procedures, . . . the Administrator in its sole discretion may suspend the vesting of any Awards granted (or a portion thereof) and/or require the forfeiture and disgorgement to the Company of any Awards (or a portion thereof) granted or vested during the twelve months prior to or any time after the Participant engaged in such misconduct and all gains earned or accrued due to the exercise of such Awards or sale of any Company Common Stock issued pursuant to such Awards.

46.    By virtue of the Awards granted to Shehadi as described further below, Shehadi

was a Participant under the Plan.

10

47.    By virtue of the Awards granted to Fayad as described further below, Fayad was a Participant under the Plan.

48.    Accordingly, at all relevant times herein, the Board's Compensation Committee, as the Plan's Administrator, has the authority to require the forfeiture and disgorgement from Defendants of any Awards granted or vested during the twelve months prior to or at any time after they engaged in one or more forms of conduct, including conduct that constitutes Cause, as well as repayment from Defendants of all gains earned or accrued due to the exercise of such Awards or sale of stock issued under such Awards.

49.    The Plan defines "Cause" for purposes of the Plan and any Awards granted thereunder.

50.    Specifically, Section 1.9 of the Plan defines "Cause" to include, among other things, "commission of a material act of fraud, embezzlement, misappropriation, misconduct against the Company or any of its Affiliates," "material violation of any material Company policy as in effect from time to time or material breach of the Participant's fiduciary duties to the Company or any of its Affiliates," "material breach of the Stockholders Agreement, the Plan, or any exchange agreement, Award Agreement, or employment, non-competition, nondisclosure or non-solicitation agreement between the Company or any of its Subsidiaries and the Participant."

51.    As the Plan's Administrator, the Board's Compensation Committee has the authority to determine whether "Cause" has occurred for purposes of a Participant's termination of employment.

52.    As the Plan's Administrator, the Board's Compensation Committee also has the authority to demand forfeiture, disgorgement, and/or repayment of gains earned or accrued pursuant to, Awards granted to Participants who engage in "Competitive Activity."

53.     Specifically, Section 11.4(c) of the Plan in pertinent part provides that "[a]ny Award vested, paid, or otherwise settled in the twelve (12) months prior to the date that the Participant engaged in Competitive Activity or at any time thereafter shall upon demand by the Administrator be immediately forfeited and disgorged or paid to the Company together with all gains earned or accrued due to the exercise of such Awards or sale of any Company Common Stock issued pursuant to such Awards."

54.     Section 1.15 of the Plan defines "Competitive Activity" to include, among other things, "(a) directly or indirectly engaging in or providing . . . or being connected as a director, officer, employee, partner, member, consultant or otherwise with, any business enterprise . . . that is engaged in the business of providing consulting services . . . or any other business activities that, as of the date of the Participant's termination of employment, are directly competitive in any geographic area with the business activities of the Company or any of its divisions, subsidiaries or Affiliates. . ." (b) without the Company's prior written consent, recruiting for employment with any entity that competes with the Company, or hiring for such entity, any employee of the Company, former employee of the Company, or independent contractor to the Company who left the Company or discontinued providing services to the Company within six (6) months of the termination of the Participant's employment," and "(c) directly or indirectly using, disclosing or disseminating to any Person or otherwise employing Confidential Information, in each case that is not approved in writing by the Administrator."

55.     Accordingly, at all relevant times herein, the Board's Compensation Committee, as the Plan's Administrator, had the authority to demand that a Participant who engaged in Competitive Activity immediately forfeit and disgorge, and repay all gains earned or accrued in connection with the exercise of or sale of stock issued under, any Award that vested or was paid

12

to the Participant during the twelve months prior to and/or at any time after such Competitive Activity.

56.     The Plan is governed by Delaware law and requires all notices and communications to Booz Allen that concern the Plan or any Awards be sent to its McLean, Virginia headquarters "to the attention of the Law Department."

57.     Participation in the Plan is voluntary.

**C.     Defendants Receive Lucrative Awards Subject to the Plan**
       **While Maintaining Business Contacts with Booz Allen's Headquarters**

58.     During their employment, Shehadi and Fayad were Participants in the Plan and were granted Awards pursuant to, and subject to the terms and conditions of, the Plan.

59.     As noted above, the version of the Plan in effect when Defendants began their employment in June 2014 was the Amended and Restated Equity Incentive Plan.   Shortly thereafter, Booz Allen issued the Second Amended and Restated Equity Incentive Plan to amend and restate its terms.

60.     The Second Amended and Restated Equity Incentive Plan remained in effect through Defendants' termination and at all relevant times thereafter, and is for all relevant purposes identical to its predecessor, the Amended and Restated Equity Incentive Plan (together, as previously defined, the "Plan").  For purposes of this lawsuit, the portions of these Plan documents relevant to the Awards of Shehadi and Fayad are the same in all material respects.

### i.    Defendant Shehadi's Awards and Business Contacts With Booz Allen's Headquarters in McLean, Virginia

61.    On or about June 23, 2014, Shehadi received a grant of approximately 25,490 stock options.

62.    Also on or about June 23, 2014, Shehadi received grants totaling approximately 92,659 shares of Booz Allen stock (including performance shares and restricted stock).

63.    All of the grants Shehadi received on or about June 23, 2014 were Awards subject to the terms and conditions of the Plan.

64.    On or about July 1, 2015, Shehadi received a grant of approximately 9,921 restricted stock units.

65.    The grant Shehadi received on or about July 1, 2015 was an Award subject to the terms and conditions of the Plan.

66.    On or about July 1, 2016, Shehadi received a grant of approximately 9,714 restricted stock units.

67.    The grant Shehadi received on or about July 1, 2016 was an Award subject to the terms and conditions of the Plan.

68.    On or about May 17, 2017, Shehadi received a grant of approximately 6,156 restricted stock units and a grant of approximately 4,104 performance stock units.

69.    Both of the grants Shehadi received on or about May 17, 2017 were Awards subject to the terms and conditions of the Plan.

70.    On or about July 3, 2017, Shehadi received a grant of approximately 8,460 restricted stock units.

71.    The grant Shehadi received on or about July 3, 2017 was an Award subject to the terms and conditions of the Plan.

14

72.   Each of Shehadi's foregoing Awards incorporate and are subject to the terms and conditions of the Plan.

73.   Each of Shehadi's foregoing Awards were accompanied by one or more written agreements, contracts, or other instruments or documents evidencing the Award, constituting "Award Agreements" within meaning of the Plan.

74.   Each of the agreements, notices, and other documents accompanying Shehadi's foregoing Awards were prepared in McLean, Virginia by employees working at Booz Allen's McLean, Virginia headquarters.

75.   Shehadi accepted each of the Awards by, among other means, sending his signed Award Acceptance document via email to Booz Allen's executive compensation lead based in McLean, Virginia, stating that he accepted the terms and conditions of the Award, and/or logging onto and accepting the Award through web-based systems hosted by Morgan Stanley Smith Barney ("Morgan Stanley") and/or Fidelity Investments ("Fidelity") on U.S.-hosted website platforms.

76.   On more than one occasion, Booz Allen's executive compensation lead in McLean, Virginia communicated with Shehadi, Morgan Stanley, and/or Fidelity to confirm Shehadi's acceptance of his Awards.

77.   In total, Shehadi was granted approximately 131,014 shares and/or units and approximately 25,490 stock options pursuant to his Awards under the Plan.

78.   In addition to being granted the foregoing Awards, Shehadi sent e-mails and made telephone calls to Company employees in McLean, Virginia to discuss matters relating to his Awards and the Plan.

79.     On numerous occasions, and often every other month during his employment, Shehadi traveled to Virginia and visited Booz Allen's and BAH Inc.'s headquarters in McLean, Virginia in connection with matters relating to his employment: for routine meetings, to receive direction from senior executives based in McLean, Virginia, and to correspond with other internal functions of Booz Allen relevant to his role, almost all of which were based centrally in McLean, Virginia.

80.     During the period of his employment, Shehadi purchased and maintained ownership of a townhouse in Vienna, Virginia.

81.     Upon information and belief, Shehadi visited the townhouse he owned in Vienna, Virginia on multiple occasions during the period of his employment.

82.     On at least one occasion, Shehadi met with a senior leader of Booz Allen at his townhouse in Vienna, Virginia to discuss matters relating to his employment.

83.     The Vienna, Virginia townhouse Shehadi owned was less than two miles away from Booz Allen's McLean headquarters.

84.     Further, before owning his townhouse or by way of preference, Shehadi requested that executive compensation personnel meet with him at his convenience at the Ritz Carlton in McLean, Virginia, within a few blocks of Booz Allen's headquarters on one of his trips during February 2017, to discuss his equity compensation and questions he had about such compensation, which he wanted to ask in-person.

85.     Upon information and belief, during the period of his employment, Shehadi traveled multiple times to locations in the United States other than Booz Allen's McLean headquarters or his townhouse in Vienna.

86.     Notwithstanding his Awards or participation in the Plan, Shehadi remained an employee of BAH Inc. at all relevant times herein.

**ii.     Defendant Fayad's Awards and Business Contacts**
**With Booz Allen's Headquarters in McLean, Virginia**

87.     On or about June 23, 2014, Fayad received a grant of approximately 19,607 stock options.

88.     The 19,607 stock options granted to Fayad were an Award subject to the terms and conditions of the Plan.

89.     ` Also on or about June 23, 2014, Fayad received grants totaling approximately 64,849 shares of Booz Allen stock (including performance shares and restricted stock).

90.     Each of the grants Fayad received on or about June 23, 2014 was an Award subject to the terms and conditions of the Plan.

91.     On or about July 1, 2015, Fayad received a grant of approximately 5,883 restricted stock units.

92.     The grant Fayad received on or about July 1, 2015 was an Award subject to the terms and conditions of the Plan.

93.     On or about July 1, 2016, Fayad received a grant of approximately 5,181 restricted stock units.

94.     The grant Fayad received on or about July 1, 2016 was an Award subject to the terms and conditions of the Plan.

95.     Each of Fayad's foregoing Awards incorporate and are subject to the terms and conditions of the Plan.

96.     Each of Fayad's foregoing Awards were accompanied by one or more written agreements, contracts, or other instruments or documents evidencing the Award, constituting "Award Agreements" within meaning of the Plan.

97.     Each of the agreements, notices, and other documents accompanying Fayad's foregoing Awards were prepared in McLean, Virginia and sent to Fayad by e-mail from employees working at Booz Allen's McLean, Virginia headquarters.

98.     Fayad received notice of the grant of stock options by e-mail sent from an employee working in Booz Allen's headquarters in McLean, Virginia.

99.     Fayad accepted each of the Awards by, among other means, sending his signed Award Acceptance document via email to Booz Allen's executive compensation lead based in McLean, Virginia, stating that he accepted the terms and conditions of the Award, and/or logging onto and accepting the Award through web-based systems hosted by Morgan Stanley and/or Fidelity.

100.    In total, Fayad was granted approximately 74,186 shares and/or units and 19,607 stock options pursuant to his Awards under the Plan.

101.    In addition to being granted the foregoing Awards, Fayad sent e-mails and made telephone calls to Booz Allen employees in McLean, Virginia to discuss matters relating to his Awards and the Plan.

102.    Upon information and belief, during the period of his employment, Fayad traveled to Virginia and visited Booz Allen's headquarters in McLean, Virginia in connection with matters relating to his employment.

103.    In addition, upon information and belief, during the period of his employment, Fayad made multiple trips to other locations in the United States.

104.    Notwithstanding his Awards or participation in the Plan, Fayad remained an employee of BAH Inc. at all relevant times herein.

**D.    Defendants Secretly Plan an Illicit Scheme to Make Off with BAH Inc.'s Employees, Information, and Competitive Advantage for the Benefit of a Direct Competitor**

105.    Each Defendant was employed by BAH Inc. in a position of great trust and confidence to which they were entrusted access to sensitive, confidential, and proprietary information concerning BAH Inc. business and its Middle Eastern commercial and organizational clients.

106.    As executives in senior leadership positions in BAH Inc.'s Abu Dhabi branch office, Defendants were exposed to, among other things, confidential and non-public information concerning BAH Inc.'s business and its Middle Eastern commercial and organizational clients.

107.    Defendants were also entrusted with access to sensitive, confidential, and proprietary information concerning BAH Inc.'s personnel, including with respect to skills, capabilities, and intellectual capital of key employees and contractors of BAH Inc.

108.    As executives in senior leadership positions in BAH Inc.'s Abu Dhabi branch office, Defendants were able to learn, among other things, confidential and non-public information concerning BAH Inc.'s personnel.

109.    Beginning in early 2017 and continuing through their eventual termination, Defendants engaged in a continuous pattern of illicit activities and misconduct in an effort to secure lucrative employment with a competing consulting company in the Middle East region ("Competitor").

110.    Competitor is a global management consulting firm and a direct competitor to BAH Inc. and Plaintiff across the Middle East region.

19

111.    Defendants' misconduct included, without limitation, their misappropriation and improper expenditure of BAH Inc. funds and resources for travel, hotel, and other expenses in order to secretly meet with senior leaders of Competitor concerning their potential employment.

112.    In addition, beginning in or around January or February 2017 and continuing through their eventual termination, Defendants also began actively recruiting current BAH Inc. employees and personnel in an effort to improperly solicit them to terminate their employment with BAH Inc. and join Competitor in direct violation of their contractual obligations under the Plan.

113.    Upon information and belief, Defendants exchanged soliciting communications with BAH Inc. personnel using technology, equipment, and/or computer devices property of, and belonging to, BAH Inc., including without limitation their BAH Inc. e-mail accounts.

114.    Defendants misappropriated and improperly expended BAH Inc. funds and resources to cover expenses incurred in attempting to solicit BAH Inc. personnel to leave BAH Inc. and join Competitor.

115.    By way of example, in September 2017, Defendants arranged and hosted BAH Inc. personnel on a boat cruise in Dubai, UAE in an effort to persuade them to follow Defendants to Competitor.

116.    Defendants misappropriated and improperly expended BAH Inc. funds and resources to arrange and host the September 2017 boat cruise, without BAH Inc.'s consent or approval.

117.    Upon information and belief, beginning in or around January or February 2017 and continuing through their eventual termination, Defendants continuously disclosed sensitive, confidential, and proprietary information of BAH Inc. to unaffiliated third parties without BAH

20

Inc.'s consent or approval, including the sensitive, confidential, and proprietary information of Middle Eastern commercial and organizational clients of BAH Inc. including pricing information, information relating to contract performance and payments, and the confidential nature of client projects related to such Middle Eastern clients.

118. Upon information and belief, among the unaffiliated third parties to whom Defendants improperly disclosed confidential and proprietary BAH Inc. information were individuals associated with Competitor.

119. Upon information and belief, Defendants improperly disclosed confidential and proprietary BAH Inc. information concerning Middle Eastern clients to individuals associated with Competitor in an effort to, among other reasons, negotiate more lucrative employment terms and improperly advantage their potential future employer (Competitor) at BAH Inc.'s expense.

120. Defendants did not have consent or permission from BAH Inc., Booz Allen, or the Plan Administrator to disclose any confidential, proprietary, and/or sensitive information of BAH Inc. to any third party, including Competitor.

121. On or about September 15, 2017, Shehadi sold 29,709 shares of stock he had been granted in connection with his Awards and which had vested on or about June 30, 2017.

122. By virtue of the foregoing sale, Shehadi earned proceeds totaling $1,186,154.97.

123. On or about March 15, 2017, Fayad exercised 7,842 stock options for a realization of $124,955.21.

124. On or about August 30, 2017, Fayad exercised 3,921 stock options for a realization of $48,436.90.

21

125.   On or about August 30, 2017, Fayad sold 19,900 shares of stock he had been granted in connection with his Awards and which had vested on or about June 30, 2017. By virtue of the foregoing sale, Fayad earned proceeds totaling $674,656.82.

**E.   Defendants Are Terminated for Cause but Refuse to Forfeit Their Awards and Repay Their Earnings as Required by the Plan**

126.   Upon learning of the serious misconduct by Defendants, Defendants' employment with BAH Inc. was terminated.

127.   Shehadi and Fayad were informed of their termination by letter dated October 13, 2017.

128.   The conduct for which Defendants were terminated, including but not limited to the conduct alleged above herein, constitutes "Cause" under the Plan and as determined by the Plan's Administrator.

129.   The conduct for which Defendants were terminated, including but not limited to the conduct alleged above herein, constitutes "Competitive Activity" under the Plan and as determined by the Plan's Administrator.

130.   The Board's Compensation Committee, as Plan Administrator, determined that pursuant to the Plan, all of the equity which was vested or paid to Defendants or otherwise settled during the twelve (12) months prior to or at any time after they engaged in Competitive Activity or conduct which gave rise to their termination for Cause was subject to forfeiture and disgorgement, and that all earnings or gains from their sales thereof must be repaid to Booz Allen.

131.   By letters dated April 1, 2019, Booz Allen demanded that Shehadi and Fayad each forfeit and/or disgorge his Awards and repay to Booz Allen all gains earned and accrued as a result of the sale of shares and/or exercise of options pursuant to Shehadi's and Fayad's respective Awards, as required by the Plan.

132.   Shehadi and Fayad were each issued a demand letter dated April 1, 2019.

133.   Each demand letter bears the subject line, "Demand for Repayment," and in part states:

> The Administrator has determined that, in connection with your previous employment with Booz Allen Hamilton Inc., you engaged in Competitive Activity and in acts constituting, and warranting your termination for Cause.  Pursuant to the Plan, any and all Awards that vested or were paid to you or otherwise settled during the twelve (12) months prior to or any time after you engaged in Competitive Activity or conduct which gave rise to your termination for Cause have therefore been forfeited pursuant to Article 11 of the Plan.

134.   Each demand letter requires immediate repayment to Booz Allen of all amounts due and owing under the Plan by no later than April 11, 2019.

135.   Shehadi and Fayad each have failed to repay to Booz Allen all gains earned and accrued as a result of the sale of shares and/or exercise of options pursuant to Shehadi's and Fayad's respective Awards, in breach of the Plan.

136.   Following their termination in 2017, Defendants and four other individuals filed suit in a UAE labor court seeking monetary and other relief in connection with their terminations under the laws of the UAE (the "UAE Action").

137.   The various plaintiffs in the UAE Action have named Booz Allen, BAH Inc., and a "foreign branch" of BAH Inc. as defendants.

138.   Notwithstanding their termination by BAH Inc. and commencement of the UAE Action, each Defendant has since commenced new employment.

139.   Upon information and belief, Shehadi commenced employment with Facebook in or around October 2018 as Managing Director in the Middle East and North Africa.  According to a press release issued by Facebook announcing his hire, Shehadi "will lead the commercial growth

and impact of Facebook and its expanding portfolio of apps, services and businesses across the region."

140.    Upon information and belief, Shehadi regularly travels to the United States in connection with his employment with Facebook, starting in October 2018 and continuing to the present day.

141.    Upon information and belief, Fayad commenced employment with Partners in Performance in or around January 2019 as a Director, assuming the role of joint Managing Director for the Middle East and North Africa (MENA) regions.

142.    As of the date hereof, the total outstanding balance of $1,186,154.97 remains due from Shehadi to Booz Allen in breach of his obligations under the Plan and the Awards granted to him thereunder.

143.    As of the date hereof, the total outstanding balance of $920,736.26 remains due from Fayad to Booz Allen in breach of his obligations under the Plan and the Awards granted to him thereunder.

### FIRST CAUSE OF ACTION
#### (Breach of Contract)
*Against All Defendants*

144.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in Paragraphs 1 through 143 above as though fully set forth herein.

145.    Plaintiff and Defendants are parties to the Plan.

146.    The Plan is a valid, binding, and enforceable contract supported by adequate consideration.

147.    Plaintiff and Defendants are also parties to those certain written Award Agreements evidencing the Awards granted to Defendants under the Plan.

24

148.    The Award Agreements are valid, binding, and enforceable contracts supported by adequate consideration.

149.    Plaintiff fully performed its obligations under the Plan and under the Award Agreements.

150.    Defendants have breached and continue to breach their contractual obligations to Plaintiff under the Plan and the Award Agreements, including but not limited to their contractual obligations to forfeit and/or disgorge all of the Awards granted and/or issued to them under the Plan.

151.    Defendants have breached and continue to breach their contractual obligations to Plaintiff under the Plan and the Award Agreements, including but not limited to their contractual obligations to repay to Plaintiff all of the gains earned and/or accrued by Defendants due to the exercise of all Awards granted and/or issued to them and due to the sale of shares and/or stock issued to them pursuant to all such Awards.

152.    As a direct and proximate result of Defendants' contractual breaches, Plaintiff has suffered, and will continue to suffer, significant injury and damage.

153.    As a direct and proximate result of Defendants' contractual breaches, Plaintiff is entitled to recover from Defendants substantial monetary and other damages in an amount to be determined at trial.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury as to all claims asserted in this Complaint that are triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor as follows:

A.  Compensatory damages of all amounts to which Plaintiff is entitled as a result of Defendants' breaches of contract;

B.  Disgorgement and/or forfeiture by Defendants of all amounts they received and will receive from the sale of stock or shares awarded under the Plan;

C.  Costs and reasonable attorneys' fees incurred by Plaintiff in an amount determined by the Court;

D.  Pre- and post-judgment interest to the fullest extent permitted by law; and

E.  Such other and further relief as the Court deems just and proper.

Dated: April 17, 2019

Respectfully Submitted,

Benjamin S. Boyd (VSB No. 28427)
Richard Kelley (VSB No. 90103)
DLA PIPER LLP (US)
500 8th Street, NW
Washington D.C., 20004
Telephone: 202-799-4000
Facsimile: 202-799-5000
benjamin.boyd@dlapiper.com

*Attorneys for Plaintiff*

26

Of Counsel:

Brian S. Kaplan
Daniel Turinsky
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212-335-4500
Facsimile: 212-335-4501
brian.kaplan@dlapiper.com
daniel.turinsky@dlapiper.com

## SECOND AMENDED AND RESTATED EQUITY INCENTIVE PLAN

### OF

### BOOZ ALLEN HAMILTON HOLDING CORPORATION

Booz Allen Hamilton Holding Corporation (the "Company") hereby adopts this Second Amended and Restated Equity Incentive Plan of Booz Allen Hamilton Holding Corporation, which amends and restates the Amended and Restated Equity Incentive Plan of Booz Allen Hamilton Holding Corporation (as amended and restated, the "Plan"). The purposes of this Plan are as follows:

      (1)     To further the growth, development and financial success of the Company and its Subsidiaries (as defined herein), by providing additional incentives to employees, consultants and directors of the Company and its Subsidiaries, who have been or will be given responsibility for the management or administration of the Company's (or one of its Subsidiaries') business affairs, by assisting them to become owners of Company Common Stock, thereby benefiting directly from the growth, development and financial success of the Company and its Subsidiaries.

      (2)     To enable the Company (and its Subsidiaries) to obtain and retain the services of the type of professional, technical and managerial employees, consultants and directors considered essential to the long-term success of the Company (and its Subsidiaries) by providing and offering them an opportunity to become owners of Company Common Stock pursuant to the exercise of Options, the grant of Restricted Stock or Restricted Stock Units, the grant of Performance Awards, the grant of other Stock-Based Awards or an offer to purchase shares of Company Common Stock.

### ARTICLE I.

### DEFINITIONS

Whenever the following terms are used in this Plan, they shall have the meaning specified below unless the context clearly indicates to the contrary. The singular pronoun shall include the plural where the context so indicates.

      Section 1.1    "Administrator" shall mean the Board or any committee of the Board designated by the Board to administer the Plan; provided, that, with respect to (i) Awards intended to qualify as performance-based compensation under Section 162(m) of the Code, the Administrator shall mean the compensation committee of the Board or such other committee or subcommittee of the Board or the compensation committee as the Board or the compensation committee shall designate, consisting of two or more members, each of whom is an "outside director" within the meaning of Section 162(m) of the Code and (ii) Awards intended to qualify for the exemption contained in Rule 16b-3 promulgated under the Exchange Act, the Administrator shall mean the compensation committee of the Board or such other committee or subcommittee of the Board or the compensation committee as the Board or the compensation committee shall designate, consisting of two or more members, each of whom is a "non-employee directors" within the meaning of such rule, or, in the alternative, the entire Board.

      Section 1.2    "Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person where "control" shall have the meaning given such term under Rule 405 of the Securities Act. For the purposes of this Plan, Affiliates of the Company shall include all Principal Stockholders.

      Section 1.3    "Alternative Award" shall have the meaning set forth in Section 13.2.

      Section 1.4    "Applicable Laws" shall mean the requirements relating to the administration of stock option, restricted stock, restricted stock unit and other equity-based compensation plans under U.S. state corporate laws, U.S. federal and state securities laws, the Code, any stock exchange or quotation system on which the Company Common

Stock is listed or quoted and the applicable laws of any other country or jurisdiction where Awards are granted under the Plan.

Section 1.5    "Award" shall mean any Option, Stock Purchase Right, Restricted Stock, Restricted Stock Unit, Performance Share, Performance Unit, Stock Appreciation Right, Dividend Equivalent, Deferred Share Unit or other Stock-Based Award granted to a Participant pursuant to the Plan, including an Award combining two or more types in a single grant.

Section 1.6    "Award Agreement" shall mean any written agreement, contract or other instrument or document evidencing an Award, including through an electronic medium.

Section 1.7    "Base Price" shall have the meaning set forth in Section 1.57.

Section 1.8    "Board" shall mean the Board of Directors of the Company.

Section 1.9    "Cause" shall mean any of the following:  (i) the Participant's commission of a material act of fraud, embezzlement, misappropriation, misconduct against the Company or any of its Affiliates, or the conviction of, or plea of no contest to, or imposition of unadjudicated probation for any crime that is a felony (or a comparable classification in a jurisdiction that does not use these terms) other than as a result of a traffic violation (unless such traffic violation results in a formal sentencing of the Participant to prison time), or the Participant's commission of a crime or other material act of misconduct that results in such Participant's loss of any government security clearance that is reasonably necessary to perform his or her material employment-related duties; (ii) the Participant's willful failure to substantially perform his or her material employment-related duties (other than any such failure resulting from the Participant's Disability) or the Participant's willful failure to carry out, or comply with, any lawful and reasonable directive of the Board or the Participant's immediate supervisor; (iii) the Participant's material violation of any material Company policy as in effect from time to time or material breach of the Participant's fiduciary duties to the Company or any of its Affiliates; (iv) the Participant's material breach of the Stockholders Agreement, the Plan, or any exchange agreement, Award Agreement, or employment, non-competition, nondisclosure or non-solicitation agreement between the Company or any of its Subsidiaries and the Participant or (v) the Participant's unlawful use (including being under the influence) or possession of illegal drugs on the Company's (or any Affiliate's) premises or while performing the Participant's duties and responsibilities; provided that, in the case of clauses (ii), (iii) or (iv), prior to October 1, 2010, such events shall only constitute Cause if not remedied within ten (10) business days (or such longer period as provided below) after receipt of written notice from the Company specifying such failure, violation or breach, as the case may be.  The determination as to whether "Cause" has occurred shall be made by the Board, acting in good faith, which shall have the authority to waive the consequences under the Plan in the event of the existence or occurrence of any of the events, acts or omissions constituting "Cause."  The Company must notify a Participant of any event alleged to constitute "Cause" within six months following the Board's knowledge of its existence or such event shall not constitute "Cause" for purposes of the Plan.  A termination for Cause shall be deemed to include a determination following a Participant's termination of employment for any reason if the circumstances existing prior to such termination would have entitled the Company or one of its Subsidiaries to have terminated such Participant's employment for Cause; provided, however, that this proviso shall not apply if, prior to termination of employment, the Board determined, following conclusion of an investigation, that such termination was not for Cause unless new facts regarding the Participant's conduct are revealed to the Board following termination of employment that result in a change in the Board's determination.  The ten (10) business day period described above with respect to awards granted prior to October 1, 2010 may be extended for such longer period as the Chief Personnel Officer or, with respect to the Chief Personnel Officer, the Chief Executive Officer shall determine, in his sole discretion.

Section 1.10    "Change in Control" shall mean the occurrence of any of the following events:

(a)    The acquisition, directly or indirectly, by any person, entity or "group" (as defined in Section 13(d) of the Exchange Act) (other than the Company, any Subsidiary, any Principal Stockholder or any Affiliate thereof, an employee benefit plan maintained by the Company, or a Person that, prior to such transaction, directly or indirectly controls, is controlled by, or is under common control with, the Company) of fifty (50) percent or more of the total combined voting power of the Company's then outstanding voting securities;

2

(b)     The merger or consolidation of the Company, as a result of which persons who were shareholders of the Company immediately prior to such merger or consolidation, together with the Principal Stockholders, do not, immediately thereafter, own, directly or indirectly, more than fifty (50) percent of the combined voting power entitled to vote generally in the election of directors of the merged or consolidated company;

(c)     The liquidation or dissolution of the Company other than a liquidation or dissolution of the Company into a Subsidiary or for the purposes of effecting a corporate restructuring or reorganization as a result of which persons who were shareholders of the Company immediately prior to such liquidation or dissolution, together with the Principal Stockholders, continue to own immediately thereafter, directly or indirectly, more than fifty (50) percent of the combined voting power entitled to vote generally in the election of directors of the entity that owns, directly or indirectly, substantially all of the assets of the Company following such transaction; or

(d)     The sale, transfer or other disposition of all or substantially all of the assets of the Company to one or more persons or entities that are not, immediately prior to such transaction, Affiliates of the Company, or any employee benefit plan of the Company (other than by way of a transaction that would not be deemed a Change in Control pursuant to clauses (a) or (b) above);

in each case, provided that such event constitutes a "change in control" within the meaning of Section 409A of the Code.

Notwithstanding the foregoing, a "Change in Control" shall not be deemed to occur if the Company files for bankruptcy, liquidation or reorganization under the United States Bankruptcy Code or as a result of any restructuring that occurs as a result of any such proceeding.

Section 1.11     "Change in Control Price" shall mean the highest price per share of Company Common Stock offered in conjunction with any transaction resulting in a Change in Control.

Section 1.12     "Code" shall mean the Internal Revenue Code of 1986, as amended.

Section 1.13     "Company" shall mean Booz Allen Hamilton Holding Corporation, a Delaware corporation, and any successor.

Section 1.14     "Company Common Stock" shall mean the class A common stock, par value $0.01 per share, of the Company and such other class of stock into which such common stock is hereafter converted or exchanged.

Section 1.15     "Competitive Activity" shall mean (a) directly or indirectly engaging in or providing, or owning, investing in, managing, joining, operating or controlling, or participating in the ownership, management, operation or control of, or being connected as a director, officer, employee, partner, member, consultant or otherwise with, any business enterprise (whether for profit or not for profit) that is engaged in the business of providing consulting services, either management or technical, staff augmentation, or any related services for any U.S. governmental entity or any other business activities that, as of the date of the Participant's termination of employment, are directly competitive in any geographic area with the business activities of the Company or any of its divisions, subsidiaries or Affiliates (including any business activities that, to the knowledge of the Participant, the Company or any of its respective divisions, subsidiaries or Affiliates has been planning to engage in prior to the Participant's termination of employment or service); (b) without the Company's prior written consent, recruiting for employment with any entity that competes with the Company, or hiring for such entity, any employee of the Company, former employee of the Company, or independent contractor to the Company who left the Company or discontinued providing services to the Company within six (6) months of the termination of the Participant's employment or (c) directly or indirectly using, disclosing or disseminating to any other Person or otherwise employing Confidential Information, in each case that is not approved in writing by the Administrator, it being understood that direct employment as an employee of (and not as a consultant or advisor to) any U.S. federal, state or local governmental entity shall not be considered a competitive activity. In the event any court of competent jurisdiction shall find that any provision hereof relating to Competitive Activity is not enforceable in accordance with its terms, the court shall reform such provisions such that the provisions shall be enforceable to the maximum extent permissible at law.

Section 1.16   "Confidential Information" shall mean any and all of three categories of information: (a) confidential proprietary information about the Company's business including, but not limited to, information that is not readily available to the public, and which concerns the Company's operations, financial results, plans and compensation structure, strategies, knowledge on-line database, clients, trade secrets, or any other proprietary information; (b) confidential information entrusted to the Company by third parties such as clients (including the U.S. government and its agencies) or vendors and (c) personally identifiable information received from employees, clients, or third parties (including, but not limited to, names, addresses, Social Security Numbers, background information, credit card or bank information, telephone or facsimile numbers, e-mail addresses and health information), which if misused could result in identity theft, credit card fraud or other serious harm.

Section 1.17   "Consultant" shall mean any natural Person who is engaged by the Company or any of its Subsidiaries to render consulting or advisory services to such entity.

Section 1.18   "Corporate Event" shall mean, as determined by the Administrator in its sole discretion, any transaction or event described in Section 14.1(a) or any unusual or nonrecurring transaction or event affecting the Company, any Subsidiary of the Company, or the financial statements of the Company or any of its Subsidiaries, or changes in applicable laws, regulations or accounting principles (including, without limitation, a recapitalization of the Company).

Section 1.19   "Covered Employee" shall have the meaning set forth in Section 162(m)(3) of the Code.

Section 1.20   "Deferred Annual Amount" shall have the meaning set forth in Section 8.1.

Section 1.21   "Deferred Share Unit" shall mean a unit credited to a Participant's account in the books of the Company under Article VIII that represents the right to receive Shares of Company Common Stock or cash equal to the Fair Market Value thereof on settlement of the account.

Section 1.22   "Director" shall mean a member of the Board or a member of the board of directors of any Subsidiary of the Company.

Section 1.23   "Disability" shall mean "disability," as such term is defined in Section 22(e)(3) of the Code.

Section 1.24   "Dividend Equivalent" shall mean the right to receive payments in cash or in Shares, based on dividends with respect to Shares.

Section 1.25   "Effective Date" shall have the meaning set forth in Section 14.9.

Section 1.26   "Elective Deferred Share Unit" shall have the meaning set forth in Section 8.1.

Section 1.27   "Eligible Representative" for a Participant shall mean such Participant's personal representative or such other person as is empowered under the deceased Participant's will or the then applicable laws of descent and distribution to represent the Participant hereunder.

Section 1.28   "Employee" shall mean any employee (as defined in accordance with the regulations and revenue rulings then applicable under Section 3401(c) of the Code) of the Company or one of its Subsidiaries, whether such employee is so employed at the time this Plan is adopted or becomes so employed subsequent to the adoption of this Plan. A person shall not cease to be an Employee in the case of (a) any leave of absence approved by the Company or (b) transfers between locations of the Company or between the Company, any of its Subsidiaries, or any successor. For purposes of Incentive Stock Options, no such leave may exceed three (3) months, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, the employment relationship shall be deemed to have terminated on the first day immediately following such three (3)-month period, and such Incentive Stock Option held by the Optionee shall cease to be treated as an Incentive Stock Option and shall be treated for tax purposes as a Non-Qualified Stock

4

Option on the first day immediately following a three (3)‑month period from the date the employment relationship is deemed terminated.

Section 1.29    "Equity Restructuring" shall mean, as determined by the Administrator in its sole discretion, a non-reciprocal transaction between the Company and its stockholders, such as a stock dividend, stock split, spin-off or recapitalization through a large, nonrecurring cash dividend, that affects the shares of Company Common Stock (or other securities of the Company) or the share price of Company Common Stock (or other securities) and causes a change in the per share value of the Company Common Stock underlying outstanding Awards.

Section 1.30    "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

Section 1.31    "Fair Market Value" of a Share as of a given date shall be:

(a)    If the Company Common Stock is listed on any established stock exchange or a national market system, the closing sales price for a Share (or the closing bid, if no sales were reported) as quoted on such exchange or system on the date of determination, as reported in *The Wall Street Journal* or, if not so reported, such other source as the Administrator deems reliable;

(b)    If the Company Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Administrator shall determine the Fair Market Value in good faith with reference to the mean between the high bid and low asked prices for a Share on the date of determination and sales prices of securities issued to investors in any recent arm's length transactions; or

(c)    In the absence of an established market for the Company Common Stock, the Fair Market Value shall be determined in good faith by the Administrator with reference to the most recent valuation of the Company Common Stock performed by an independent valuation consultant or appraiser of nationally recognized standing (which valuation shall be prepared not less frequently than annually) and sales prices of securities issued to investors in any recent arm's length transactions.

Section 1.32    "Incentive Stock Option" shall mean an Option which qualifies under Section 422 of the Code and is designated as an Incentive Stock Option by the Administrator.

Section 1.33    "Leadership Team" shall mean the group of senior executives of the Company with policy-making functions, as designated by the Chief Executive Officer of the Company.

Section 1.34    "Non-Qualified Stock Option" shall mean an Option which is not an "incentive stock option" under Section 422 of the Code and shall include an Option which is designated as a Non-Qualified Stock Option by the Administrator.

Section 1.35    "Non-U.S. Awards" shall have the meaning set forth in Section 12.4.

Section 1.36    "Option" shall mean an option to purchase Company Common Stock granted under the Plan. The term "Option" includes both an Incentive Stock Option and a Non-Qualified Stock Option.

Section 1.37    "Option Price" shall have the meaning set forth in Section 4.3.

Section 1.38    "Optionee" shall mean a Participant to whom an Option or SAR is granted under the Plan.

Section 1.39    "Participant" shall mean any Service Provider who has been granted an Award pursuant to the Plan.

Section 1.40    "Performance Award" shall mean Performance Shares, Performance Units and all other Awards that vest (in whole or in part) upon the achievement of specified Performance Goals.

Section 1.41   "Performance Cycle" shall mean the period of time selected by the Administrator during which performance is measured for the purpose of determining the extent to which a Performance Award has been earned or vested.

Section 1.42   "Performance Goals" means the objectives established by the Administrator for a Performance Cycle pursuant to Section 7.4 for the purpose of determining the extent to which a Performance Award has been earned or vested.

Section 1.43   "Performance Share" means an Award granted pursuant to Article VII of the Plan of a contractual right to receive a Share (or the cash equivalent thereof) upon the achievement, in whole or in part, of the applicable Performance Goals.

Section 1.44   "Performance Unit" means a dollar-denominated unit (or a unit denominated in the Participant's local currency) granted pursuant to Article VII of the Plan, payable upon the achievement, in whole or in part, of the applicable Performance Goals.

Section 1.45   "Permitted Transfer" shall have the meaning ascribed to such term in the Stockholders Agreement.

Section 1.46   "Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or any other entity of whatever nature.

Section 1.47   "Plan" shall have the meaning set forth in the Preamble hereto.

Section 1.48   "Principal Stockholders" shall mean (i) the Initial Carlyle Stockholders (as defined in the Stockholders Agreement) and (ii) any of their Affiliates to which (a) any of the Principal Stockholders identified in clause (i) or any other Person transfers Company Common Stock or (b) the Company issues Company Common Stock.

Section 1.49   "Public Offering" shall mean the first day as of which (i) sales of Company Common Stock are made to the public in the United States pursuant to an underwritten public offering of the Company Common Stock led by one or more underwriters at least one of which is an underwriter of nationally recognized standing or (ii) the Administrator has determined that the Company Common Stock otherwise has become publicly traded for this purpose.

Section 1.50   "Restricted Stock" shall mean an Award granted pursuant to Section 6.1.

Section 1.51   "Restricted Stock Unit" shall mean an Award granted pursuant to Section 6.2.

Section 1.52   "Secretary" shall mean the Secretary of the Company.

Section 1.53   "Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.54   "Service Award" shall mean all Awards that vest solely based on the passage of time or continued service over a fixed period of time.

Section 1.55   "Service Provider" shall mean an Employee, Consultant or Director.

Section 1.56   "Share" shall mean a share of Company Common Stock.

Section 1.57   "Stock Appreciation Right" or "SAR" shall mean the right to receive a payment from the Company in cash and/or Shares equal to the product of (i) the excess, if any, of the Fair Market Value of one Share on the exercise date over a specified price (the "Base Price") fixed by the Administrator on the grant date (which specified price shall not be less than the Fair Market Value of one Share on the grant date), multiplied by (ii) a stated number of Shares.

6

Section 1.58   "Stock-Based Award" shall have the meaning set forth in Section 9.1.

Section 1.59   "Stock Purchase Right" shall mean an Award granted pursuant to Section 3.4.

Section 1.60   "Stockholders Agreement" shall mean that certain agreement by and among each Participant, the Principal Stockholders, the Company and other parties thereto, which contains certain restrictions and limitations applicable to Awards granted under this Plan, as may be amended from time to time. Prior to a Public Offering, if the Participant is not a party to the Stockholders Agreement at the time of grant of an Award of Shares, settlement of an Award, purchase of Company Common Stock pursuant to a Stock Purchase Right or exercise of an Option or SAR (or any portion thereof), the time of grant of such Award, settlement of such Award, purchase of Company Common Stock pursuant to a Stock Purchase Right or, as applicable, the exercise of an Option or SAR shall be subject to the condition that the Participant enter into the Stockholders Agreement with the Company in the form provided to the Participant by the Company.

Section 1.61   "Subplans" shall have the meaning set forth in Section 12.4.

Section 1.62   "Subsidiary" of any entity shall mean any corporation in an unbroken chain of corporations beginning with such entity if each of the corporations other than the last corporation in the unbroken chain then owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

Section 1.63   "Termination of employment," "termination of service" and any similar term or terms shall mean, with respect to a director who is not an Employee of the Company or any of its Subsidiaries, the date upon which such director ceases to be a member of the Board, with respect to a Consultant who is not an Employee of the Company or any of its Subsidiaries, the date upon which such Consultant ceases to provide consulting or advisory services to the Company or any of its Subsidiaries, and, with respect to an Employee, the date the Participant ceases to be an Employee; provided, that, with respect to any Award subject to Section 409A of the Code, such terms shall mean "separation from service," as defined in Section 409A of the Code and the rules, regulations and guidance promulgated thereunder.

Section 1.64   "Withholding Taxes" shall mean the statutory minimum of any federal, state, local or foreign income taxes, withholding taxes or employment taxes required to be withheld under Applicable Law.


## ARTICLE II.

### SHARES SUBJECT TO THE PLAN

Section 2.1   Shares Subject to Plan.

(a)   Subject to Section 14.1, the aggregate number of Shares which may be issued under this Plan is 33,000,000; provided, however, that subject to Section 2.1(b), no more than 33,000,000 Shares shall be issued in the form of Options under the Plan. The Shares may be authorized but unissued, or reacquired Company Common Stock.

(b)   To the extent that an Award terminates, is forfeited, is repurchased, expires, or lapses for any reason, any Shares subject to the Award shall again be available for the grant of an Award pursuant to the Plan; provided, however, that vested Shares that are repurchased after being issued from the Plan shall not be available for future issuance under the Plan. Additionally, any Shares tendered or withheld to satisfy the grant or exercise price or tax withholding obligation pursuant to any Award shall again be available for the grant of an Award pursuant to the Plan. To the extent permitted by Applicable Law, Shares issued in assumption of, or in substitution for, any outstanding awards of any entity acquired in any form of combination by the Company or any of its Subsidiaries shall not be counted against Shares available for grant pursuant to this Plan.

7

Section 2.2    Individual Award Limitations.  Subject to Section 2.1(a) and Section 14.1, the following individual Award limits shall apply for those Awards intended to qualify as performance-based compensation under Section 162(m) of the Code:

(a)    No Participant may receive the right to more than 450,000 Performance Shares, shares of performance-based Restricted Stock and Restricted Stock Units and performance-based Deferred Share Units under the Plan in any one year.

(b)    No Participant may receive the right to Performance Units under the Plan in any one year with a value of more than US $5,000,000 (or the equivalent of such amount denominated in the Participant's local currency).

(c)    No Participant may receive Options, SARs or any other Award based solely on the increase in value of the Shares on more than 700,000 Shares under the Plan in any one year.

Section 2.3    Prohibition Against Repricing.  Except to the extent (i) approved in advance by holders of a majority of the Shares entitled to vote generally in the election of directors or (ii) as a result of any Corporate Event, the Administrator shall not have the power or authority to reduce, whether through amendment or otherwise, the exercise price of any outstanding Option or base price of any outstanding Stock Appreciation Right or to grant any new Award, or make any cash payment, in substitution for or upon the cancellation of Options or Stock Appreciation Rights previously granted.

## ARTICLE III.

## GRANTING OF OPTIONS AND SARS AND SALE OF COMPANY COMMON STOCK

Section 3.1    Eligibility.  Non-Qualified Stock Options and Stock Appreciation Rights may be granted to Service Providers.  Subject to Section 3.2, Incentive Stock Options may only be granted to Employees.

Section 3.2    Qualification of Incentive Stock Options.  No Employee may be granted an Incentive Stock Option under the Plan if such Employee, at the time the Incentive Stock Option is granted, owns stock possessing more than ten (10) percent of the total combined voting power of all classes of stock of the Company or any then existing Subsidiary of the Company or "parent corporation" (within the meaning of Section 424(e) of the Code) unless such Incentive Stock Option conforms to the applicable provisions of Section 422 of the Code.

Section 3.3    Granting of Options and Stock Appreciation Rights to Service Providers.

(a)    Options and Stock Appreciation Rights.  The Administrator may from time to time:

(i)    Select from among the Service Providers (including those to whom Options or SARs have been previously granted under the Plan) such of them as in its opinion should be granted Options and/or SARs;

(ii)    Determine the number of Shares to be subject to such Options and/or SARs granted to such Service Provider, and determine whether such Options are to be Incentive Stock Options or Non-Qualified Stock Options; and

(iii)    Determine the terms and conditions of such Options and SARs, consistent with the Plan.

Stock Appreciation Rights may be granted in tandem with Options or may be granted on a freestanding basis, not related to any Option.  Unless otherwise determined by the Administrator at or after the grant date, Stock Appreciation Rights granted in tandem with Options shall have substantially similar terms and conditions to such Options to the extent applicable, or may be granted on a freestanding basis, not related to any Option.

8

(b)     Upon the selection of a Service Provider to be granted an Option or SAR under this Section 3.3, the Administrator shall instruct the Secretary or another authorized officer to issue such Option or SAR and may impose such conditions on the grant of such Option or SAR as it deems appropriate. Without limiting the generality of the preceding sentence, but subject to Section 2.3, the Administrator may, subject to applicable securities laws, require as a condition to the grant of an Option or SAR to a Service Provider that the Service Provider surrender for cancellation all or a portion of the unexercised Options or SARs which have previously been granted to him or her. An Option or SAR, the grant of which is conditioned upon such surrender, may have an Option Price or Base Price that is lower (or higher) than the Option Price or Base Price of the surrendered Option or SAR, may cover the same (or a lesser or greater) number of Shares as the surrendered Option or SAR, may contain such other terms as the Administrator deems appropriate and shall be exercisable in accordance with its terms, without regard to the number of Shares, price, period of exercisability or any other term or condition of the surrendered Option or SAR. Subject to Section 14.3 of the Plan, any Incentive Stock Option granted under the Plan may be modified by the Administrator, without the consent of the Optionee, even if such modification would result in the disqualification of such Option as an "incentive stock option" under Section 422 of the Code.

Section 3.4     Sale of Company Common Stock to Service Providers. The Administrator, acting in its sole discretion, may from time to time designate one or more Service Providers to whom an offer to sell Shares shall be made and the terms and conditions thereof, provided, however, that the price per Share shall not be less than the Fair Market Value of such Shares on the date any such offer is accepted. Each Share sold to a Service Provider under this Section 3.4 shall be evidenced by a written stock purchase agreement in a form approved by the Board, which shall contain terms consistent with the terms hereof. Any Shares sold under this Section 3.4 shall be subject to the same limitations, restrictions and administration hereunder as would apply to any Shares issued pursuant to the exercise of an Option under this Plan including, but not limited to, conditions and restrictions set forth in Section 5.6 below. Shares acquired pursuant to this Section 3.4 prior to a Public Offering shall also be subject to the terms and conditions of a Stockholders Agreement, which shall be entered into with the Participant upon the acquisition of such Shares.

**ARTICLE IV.**

**TERMS OF OPTIONS AND SARS**

Section 4.1     Award Agreement.

(a)     Each Option and each Stock Appreciation Right shall be evidenced by a written Award Agreement, which shall be executed by the Optionee and an authorized officer and which shall contain such terms and conditions as the Administrator shall determine, consistent with the Plan. Award Agreements evidencing Incentive Stock Options shall contain such terms and conditions as may be necessary to qualify such Options as "incentive stock options" under Section 422 of the Code.

(b)     The Administrator may, at any time, and from time to time, amend the terms of any one or more existing Award Agreements, provided, however, that subject to the provisions of this Plan the rights of an Optionee under an Award Agreement shall not be adversely impaired in any material respect without the Optionee's written consent. The Company shall provide an Optionee with written notice of any amendment made to such Optionee's existing Award Agreement.

Section 4.2     Exercisability and Vesting of Options and Stock Appreciation Rights.

(a)     Each Option and SAR shall vest and become exercisable according to the terms of the applicable Award Agreement; provided, however, that by a resolution adopted after an Option or SAR is granted the Administrator may, on such terms and conditions as it may determine to be appropriate, accelerate the time at which such Option or SAR or any portion thereof may be exercised.

9

(b)     Except as otherwise provided by the Administrator or in the applicable Award Agreement, no portion of an Option or SAR which is unexercisable on the date that an Optionee incurs a termination of service as a Service Provider shall thereafter become exercisable.

(c)     The aggregate Fair Market Value (determined as of the time the Option is granted) of all Shares with respect to which Incentive Stock Options are first exercisable by a Service Provider in any calendar year may not exceed $100,000 or such other limitation as imposed by Section 422(d) of the Code, or any successor provision. To the extent that Incentive Stock Options are first exercisable by a Participant in excess of such limitation, the excess shall be considered Non-Qualified Stock Options.

(d)     Stock Appreciation Rights granted in tandem with an Option shall become vested and exercisable on the same date or dates as the Options with which such Stock Appreciation Rights are associated vest and become exercisable. Stock Appreciation Rights that are granted in tandem with an Option may only be exercised upon the surrender of the right to exercise such Option for an equivalent number of Shares, and may be exercised only with respect to the Shares for which the related Option is then exercisable.

Section 4.3     Option Price and Base Price. The per Share purchase price of the Shares subject to each Option (the "Option Price") and the Base Price of each Stock Appreciation Right shall be set by the Administrator and shall be not less than 100% of the Fair Market Value of such Shares on the date such Option or SAR is granted.

Section 4.4     Expiration of Options and SARs. No Option or SAR may be exercised to any extent by anyone after the first to occur of the following events:

(a)     The expiration of ten (10) years from the date the Option or SAR was granted; or

(b)     With respect to an Incentive Stock Option in the case of an Optionee owning (within the meaning of Section 424(d) of the Code), at the time the Incentive Stock Option was granted, more than 10% of the total combined voting power of all classes of stock of the Company or any Subsidiary, the expiration of five (5) years from the date the Incentive Stock Option was granted.

**ARTICLE V.**

**EXERCISE OF OPTIONS AND SARS**

Section 5.1     Person Eligible to Exercise. During the lifetime of the Optionee, only he or she may exercise an Option or SAR (or any portion thereof) granted to him or her; provided, however, that the Optionee's Eligible Representative may exercise his or her Option or SAR or portion thereof during the period of the Optionee's Disability. After the death of the Optionee, any exercisable portion of an Option or SAR may, prior to the time when such portion becomes unexercisable under the Plan or the applicable Award Agreement, be exercised by his or her Eligible Representative.

Section 5.2     Partial Exercise. At any time and from time to time prior to the time when the Option or SAR becomes unexercisable under the Plan or the applicable Award Agreement, the exercisable portion of an Option or SAR may be exercised in whole or in part; provided, however, that the Company shall not be required to issue fractional Shares and the Administrator may, by the terms of the Option or SAR, require any partial exercise to exceed a specified minimum number of Shares.

Section 5.3     Manner of Exercise. An exercisable Option or SAR, or any exercisable portion thereof, may be exercised solely by delivery to the Secretary of all of the following prior to the time when such Option or SAR or such portion becomes unexercisable under the Plan or the applicable Award Agreement:

(a)     Subject to any conditions that may be imposed by the Administrator, notice in writing signed by the Optionee or his or her Eligible Representative, stating that such Option or SAR or portion is being exercised, and specifically stating the number of Shares with respect to which the Option or SAR is being exercised;

(b)     If required by the Administrator, a copy of the Stockholders Agreement signed by the Optionee or Eligible Representative, if applicable;

(c)     (i)     With respect to the exercise of any Option, full payment (in cash (through wire transfer only) or by personal, certified, or bank cashier check) of the aggregate Option Price of the Shares with respect to which such Option (or portion thereof) is thereby exercised; or

(ii)     With the consent of the Administrator, (A) Shares owned by the Optionee duly endorsed for transfer to the Company or (B) Shares issuable to the Optionee upon exercise of the Option, with a Fair Market Value on the date of Option exercise equal to the aggregate Option Price of the Shares with respect to which such Option (or portion thereof) is thereby exercised or

(iii)     With the consent of the Administrator, any form of payment permitted by Applicable Laws and any combination of the foregoing methods of payment.

(d)     Full payment to the Company (in cash or by personal, certified or bank cashier check or by any other means of payment approved by the Administrator) of all minimum amounts necessary to satisfy any and all Withholding Taxes arising in connection with the exercise of the Option or SAR;

(e)     Such representations and documents as the Administrator deems necessary or advisable to effect compliance with all applicable provisions of the Securities Act and any other federal or state securities laws or regulations. The Administrator may, in its sole discretion, also take whatever additional actions it deems appropriate to effect such compliance including, without limitation, placing legends on share certificates and issuing stop-transfer orders to transfer agents and registrars and

(f)     In the event that the Option or SAR or portion thereof shall be exercised as permitted under Section 5.1 by any person or persons other than the Optionee, appropriate proof of the right of such person or persons to exercise the Option or SAR or portion thereof.

Section 5.4     Optionee Representations. The Administrator, in its sole discretion, may require an Optionee to make certain representations or acknowledgements, on or prior to the purchase of any Shares pursuant to any Option or SAR granted under this Plan, in respect thereof including but not limited to that the Optionee is acquiring the Shares for an investment purpose and not for resale, and, if the Optionee is an Affiliate, additional acknowledgements regarding when and to what extent any transfers of such Shares may occur.

Section 5.5     Settlement of SARs. Unless otherwise determined by the Administrator, upon exercise of a Stock Appreciation Right, the Participant shall be entitled to receive payment in the form, determined by the Administrator, of Shares, or cash, or a combination of Shares and cash having an aggregate value (based in the case of Shares on Fair Market Value) equal to the amount determined by multiplying:

(a)     any increase in the Fair Market Value of one Share on the exercise date over the Base Price of such Stock Appreciation Right, by

(b)     the number of Shares with respect to which the Stock Appreciation Right is exercised;.

(c)     provided, however, that on the grant date, the Administrator may establish, in its sole discretion, a maximum amount per Share that may be payable upon exercise of a Stock Appreciation Right, and provided, further, that in no event shall the value of the Company Common Stock or cash delivered on exercise exceed the excess of the Fair Market Value of the Shares with respect to which the Stock Appreciation Right is exercised over the Fair Market Value of such Shares on the grant date of such Stock Appreciation Right.

Section 5.6     Conditions to Issuance of Stock Certificates. The Shares issuable and deliverable upon the exercise of an Option or SAR, or any portion thereof, may be either previously authorized but unissued Shares or issued Shares which have then been reacquired by the Company, subject to Section 2.1(b). The Company shall record

11

shares delivered upon exercise of an Option or SAR in the books and records of the Company or a certificate of Shares will be delivered to the Optionee at the Company's principal place of business as soon as practicable after the Option or SAR is properly exercised or the Company may, in the Administrator's discretion, retain physical possession of the certificate until such time as the Administrator deems appropriate. Notwithstanding the above, the Company shall not be required to issue or deliver any certificate or certificates for Shares purchased upon the exercise of any Option or SAR or portion thereof prior to fulfillment of all of the following conditions:

(a)     The admission of such Shares to listing on any and all stock exchanges on which such class of Company Common Stock is then listed;

(b)     The completion of any registration or other qualification of such Shares under any state or federal law or under the rulings or regulations of the Securities and Exchange Commission or any other governmental regulatory body, which the Administrator shall, in its sole discretion, deem necessary or advisable;

(c)     The obtaining of any approval or other clearance from any state or federal governmental agency which the Administrator shall, in its sole discretion, determine to be necessary or advisable and

(d)     The payment to the Company (or its Subsidiary, as applicable) of all amounts which it is required to withhold under Applicable Law in connection with the exercise of the Option or SAR.

The Administrator shall not have any liability to any Optionee for any delay in the delivery of Shares to be issued upon an Optionee's exercise of an Option or SAR.

Section 5.7     Rights as Stockholders.  The holder of an Option or SAR shall not be, nor have any of the rights or privileges of, a stockholder of the Company in respect of any Shares purchasable upon the exercise of any part of an Option or SAR unless and until such holder has, to the extent required by the Administrator, signed a Stockholders Agreement and certificates representing such Shares have been issued by the Company to such holder.

Section 5.8     Transfer Restrictions.  Shares acquired upon exercise of an Option or SAR may be subject to the terms and conditions of a Stockholders Agreement. In addition, the Administrator, in its sole discretion, may impose further restrictions on the transferability of the Shares purchasable upon the exercise of an Option or SAR as it deems appropriate. Any such restriction shall be set forth in the respective Award Agreement and may be referred to on the certificates evidencing such Shares. The Administrator may require the Employee to give the Company prompt notice of any disposition of Shares acquired by exercise of an Incentive Stock Option, within two (2) years from the date of granting such Option or one (1) year after the transfer of such Shares to such Employee. The Administrator may direct that the certificates evidencing Shares acquired by exercise of an Incentive Stock Option refer to such requirement.

**ARTICLE VI.**

**RESTRICTED STOCK AWARDS AND RESTRICTED STOCK UNIT AWARDS**

Section 6.1     Restricted Stock.

(a)     Grant of Restricted Stock.  The Administrator is authorized to make Awards of Restricted Stock to any Service Provider selected by the Administrator in such amounts and subject to such terms and conditions as determined by the Administrator. All Awards of Restricted Stock shall be evidenced by an Award Agreement.

(b)     Issuance and Restrictions.  Restricted Stock shall be subject to such restrictions on transferability and other restrictions as the Administrator may impose (including, without limitation, limitations on the right to vote Restricted Stock or the right to receive dividends on the Restricted Stock). These restrictions may lapse separately or in combination at such times, pursuant to such circumstances, in such installments, or otherwise, as the Administrator determines at the time of the grant of the Award or thereafter.

        (c)    <u>Certificates for Restricted Stock</u>.  Restricted Stock granted pursuant to the Plan may be evidenced in such manner as the Administrator shall determine.  If certificates representing shares of Restricted Stock are registered in the name of the Participant, certificates must bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock, and the Company may, at its discretion, retain physical possession of the certificate until such time as all applicable restrictions lapse.

        <u>Section 6.2</u>    <u>Restricted Stock Units</u>.  The Administrator is authorized to make Awards of Restricted Stock Units to any Service Provider selected by the Administrator in such amounts and subject to such terms and conditions as determined by the Administrator.  At the time of grant, the Administrator shall specify the date or dates on which the Restricted Stock Units shall become fully vested and nonforfeitable, and may specify such conditions as to vesting as it deems appropriate.  At the time of grant, the Administrator shall specify the maturity date applicable to each grant of Restricted Stock Units which shall be no earlier than the vesting date or dates of the Award and may be determined at the election of the grantee.  On the maturity date, the Company shall, subject to the terms of this Plan, transfer to the Participant one Share for each Restricted Stock Unit scheduled to be paid out on such date and not previously forfeited.  The Administrator shall specify the purchase price, if any, to be paid by the grantee to the Company for such Shares.

        <u>Section 6.3</u>    <u>Rights as a Stockholder</u>.  A Participant shall not have any rights as a stockholder in respect of Restricted Stock Units awarded pursuant to the Plan (including but not limited to the right to vote on any matter submitted to the Company's stockholders) until such time as the Shares attributable to such Restricted Stock Units have been issued to such Participant or his or her beneficiary.

**ARTICLE VII.**

**<u>PERFORMANCE SHARES AND PERFORMANCE UNITS</u>**

<u>Section 7.1</u>

        (a)    <u>Grant of Performance Awards</u>.  The Administrator is authorized to make Awards of Performance Shares and Performance Units to any Participant selected by the Administrator in such amounts and subject to such terms and conditions as determined by the Administrator.  All Performance Shares and Performance Units shall be evidenced by an Award Agreement.

        (b)    <u>Issuance and Restrictions</u>.  The Administrator shall have the authority to determine the Participants who shall receive Performance Shares and Performance Units, the number of Performance Shares and the number and value of Performance Units each Participant receives for any Performance Cycle, and the Performance Goals applicable in respect of such Performance Shares and Performance Units for each Performance Cycle.  Any adjustments to such Performance Goals shall be approved by the Administrator.  The Administrator shall determine the duration of each Performance Cycle (the duration of Performance Cycles may differ from one another), and there may be more than one Performance Cycle in existence at any one time.  Unless otherwise determined by the Administrator, the Performance Cycle for Performance Shares and Performance Units shall be three (3) years.  An Award Agreement evidencing the grant of Performance Shares or Performance Units shall specify the number of Performance Shares and the number and value of Performance Units awarded to the Participant, the Performance Goals applicable thereto, and such other terms and conditions not inconsistent with the Plan as the Administrator shall determine.  No Company Common Stock will be issued at the time an Award of Performance Shares is made, and the Company shall not be required to set aside a fund for the payment of Performance Shares or Performance Units.

        <u>Section 7.2</u>    <u>Earned Performance Shares and Performance Units</u>.  Performance Shares and Performance Units shall become earned, in whole or in part, based upon the attainment of specified Performance Goals or the occurrence of any event or events, including a Corporate Event, as the Administrator shall determine, either at or after the grant date.  In addition to the achievement of the specified Performance Goals, the Administrator may, at the grant date, condition payment of Performance Shares and Performance Units on such conditions as the Administrator shall specify.  The Administrator may also require the completion of a minimum period of service (in addition to the

13